Submitted on record December 4, 1973, accused
suspended April 18, petition for rehearing
denied May 14, 1974

IN RE COMPLAINT AS TO THE CONDUCT OF
## CHARLES R. HARVEY, *Accused.*
521 P2d 327

No appearances.

PER CURIAM.

The accused is charged by the Oregon State Bar with four specific occurrences of unprofessional conduct, each involving a separate client. He is also accused by a fifth charge of commingling funds of each of the four clients with those of his own. The principal circumstances surrounding his relationship with each client, with one exception, will be recounted in turn, together with the action of the trial committee taken thereon.

The first charge alleges that Hazel Wood retained the accused in accordance with the following written contract to represent her in obtaining the release of her husband from the Oregon State Penitentiary:

"Received from Mrs. Hazel Wood, $400 for retainer and $2,100 to be held in trust for 120 days and to be applied on attorney's fees at such time as her husband obtains parole or work release within that time, otherwise, $2,100 to be refunded to her.
/s/ Charles R. Harvey"

The charge further alleges that the accused failed to obtain the husband's release within the time specified in the agreement or a reasonable time thereafter, and that despite such failure, upon demand, the accused failed to return the $2,100 to Mrs. Wood.

It is admitted that the contract was entered into on February 15, 1971, and that the $2,500 was paid that day in two separate checks: one for $400 and the other for $2,100. Though the accused had a trust account, the $2,100 which he agreed to hold in trust was never deposited in the account. On February 17 the funds represented by that check were converted into a cashier's check and there are no further records of the funds. The accused testified that he converted the funds into the cashier's check so that he could pack them around on his person and keep them from being attached by the Internal Revenue Service with whom he was having some difficulties. He is unable to show any specific bookkeeping entry concerning the ultimate disposition of these funds. The accused did not testify about when or how his claimed difficulty with the Internal Revenue Service was alleviated but it must have been prior to the following March 24, because at that time he deposited $5,000 in the trust account apparently without fear of attachment.

At the end of the 120 days specified in the agreement, Mrs. Wood's husband had not yet been released. Both parties thereafter treated the contract as still being in effect until Mrs. Wood requested the return of the money, sometime prior to the middle of September of 1971. It was not returned to her and she retained a lawyer who brought an action for its recovery upon her behalf. The demand was for the entire $2,500 and various unsuccessful efforts to compromise the matter were made by the parties. The case was ultimately tried, however, and resulted in a judgment for Mrs. Wood in the sum of $2,100 in November of 1972. The judgment was promptly paid by the accused.

The accused contends that at the time of entering into the agreement it was understood that Mrs. Wood was to get a letter from her husband's former employer to the effect that her husband had a job waiting for him if he was released, but that she never produced such a letter. Mrs. Wood agrees that she was to get the letter but that she could not secure it as she had anticipated. The accused's position is that he could have secured the release of the husband had he not been prevented from doing so by the failure of Mrs. Wood to produce the letter and that he performed services over and above those contemplated by the $400 retainer which were effective in the ultimate release of her husband on parole in August of 1972. The husband testified that at no time was he ever contacted by the accused. The evidence indicates that the accused told Mrs. Wood how her husband should conduct himself while in the prison and that this information was transmitted to the husband. The accused also testified that he contacted someone within the prison concerning the husband and that he had extensive investigations

made of the original circumstances of the crime and of the attitude of the community towards the husband's anticipated return to society. There appears to be no direct link between the release of the husband and the efforts of the accused unless the husband's exemplary conduct in prison could be attributed to the accused's advice.

The trial committee found that the fee of $2,100 was not earned in conformance with the agreement between Mrs. Wood and the accused and that he commingled the funds of Mrs. Wood's with those of his own.

The trial committee concluded his conduct was unethical.

The second charge against the accused alleges that on March 23, 1971, one Williams retained the accused to represent him in securing a license for a cocktail lounge from the State of Oregon. The agreement was in writing as follows:

"Know all men by these presents that the following agreement is made between Richard Williams and Charles R. Harvey, Attorney, as follows:

"Richard Williams pays to Charles R. Harvey the sum of Five Thousand ($5,000) Dollars to be deposited in his clients' trust account conditioned on Richard Williams receiving a class DB liquor license from the State of Oregon.

"In the event that this license is not granted on the original application, the aforesaid sum of Five Thousand ($5,000) Dollars will be refunded to the said Richard Williams.

"Dated at Portland, Oregon, this 23rd day of March 1971.

/s/ Richard Williams
Richard Williams
/s/ Charles R. Harvey
Charles R. Harvey"

It is alleged that the accused failed to secure the liquor license or to take any steps reasonably required to secure the same, and refused to return the $5,000 or any part thereof on demand.

The $5,000 was paid on March 23, the day of the agreement, by check and deposited in the accused's trust account on the next day. At the time of the deposit there was only $18.72 in the account. The following withdrawals were made from the account without further deposits:

March  24—$500
March  29—$250 and $701.11
April 1    —$400 and $2,180.37
April 5    —$350
April 6    —$500

There then remained only $137.24 in the account.

Williams testified that about the first of June he was informed by the liquor commission that some documents had been filed in error directly with the commission rather than through the Multnomah County Clerk's office; and he also found that no application had yet been filed. He said he then went to the commission, picked up an application, went to the accused's office and picked up his lease on the premises and the diagram for remodeling which was to be filed with the application, and then filled out the application which he filed himself. A copy of the application is in evidence and appears to be filled out in Williams' handwriting. At that time Williams wrote a letter to the accused which is in evidence and reads as follows:

"Due to the unusual delay in filing my application for a Liquor license, it has placed me in a very delicate financial position. As your client I hereby instruct you to discontinue any effort to obtain the

license and return my money. I'm sure a reasonable fee is in order for your effort so please let me know."

The evidence indicates that after writing this letter, Williams had a conference with the accused who continued to represent Williams with Williams' consent. Williams later received a letter from the commission dated June 25 stating that the application had been placed on file with no action taken because the commission had placed a moratorium for an indefinite period upon the issuance of all such licenses pending a survey which was in progress. On July 14, the commission again informed Williams that no action had been taken on his application because of the moratorium. However, the commission's file indicates that Williams had been approved as to character qualifications by the Multnomah County Sheriff, and an inspection by a field inspector had been made by July 2 which resulted in the inspector's recommendation that the license be granted subject to a final sanitation inspection upon completion of the improvements.

Williams testified that after the second notice he went to the accused and told him to take out a reasonable fee and to return his money to him, but the accused refused. On August 17 Williams had to forfeit his lease on the premises for non-payment of his rent which he claims resulted from running out of money due to the lapse of time and his failure to operate profitably the premises as a tavern.

The accused acknowledged that Williams prepared the application in his own handwriting and may have physically filed it, but claims that all of this was under his direction. He claimed handwritten applications which appear to have been made by an individual

have a better chance of success than those purportedly filed by attorneys. He says, however, that the written agreement between him and Williams was not a true portrayal of their actual agreement. He testified that he had an oral understanding with Williams that the money was not to be held in trust but was available for expenses of investigation and to be drawn against for services, although he admits he was obligated to return the entire $5,000 if the application failed. He also says that the contingency upon which the fee was to be earned was staff approval rather than the granting of the license, as staff approval was tantamount to a license being granted. He claims that staff approval was secured. The commission's records are in evidence. A commission staff member testified that staff approval was not tantamount to commission approval and that the file demonstrates that the application was never considered by the staff or the commission.

The accused also testified that the reason the written agreement provided that all the money would be held in trust was because Williams had explained to him that he had $5,000 on deposit with his brother and that before his brother would give it to him he had to show that it would be held in trust for return if the application was unsuccessful. Why this was necessary if the money was actually Williams' was never explained. Williams testified he told the accused it was borrowed money. The following colloquy took place between the chairman of the trial committee and the accused:

"THE CHAIRMAN: But there is a difference between refunding and holding it in trust, isn't there?

"WITNESS: Definitely.

"THE CHAIRMAN: So then what you are telling us, at least as I understand it, correct me if I am wrong, is that one of the reasons you have signed that was to mislead the brother who proved to be nonexistant [sic]?

"WITNESS: That's the very objection I raised when he asked me to do that. He said, 'You have agreed to refund my money if you don't get it, what are you worried about?' He said, 'It's my money, it's between me and my brother,' and that—I did it, and I shouldn't have done it. When he told me he didn't have a brother, I knew just how grievously I had erred and how far my neck had been stuck out."

The $5,000 was actually furnished to Williams by the lessor of the premises upon which the application was being made.

The accused testified that the reason the application was not filed immediately was that he was waiting for a time to file it when there were not many applications pending before the commission, because his experience had been that an application was more likely to be granted under such circumstances. He also testified that much of the work had already been done by him by the time the written agreement was entered into and the money was paid to him by Williams. He said he personally inspected the premises and consulted with Williams there several times and that he had an investigation made of the surrounding area with a view to seeing how many other outlets there were and whether anybody in the neighborhood was opposed to the application. There are copies of two different reports to the accused by his investigator in the record: one purports to be a preliminary investigation and is dated March 12; the other is a more detailed investiga-

tion dated June 30, which states it was made from June 5 through June 22.

The accused contends that he expended time and effort commensurate with the $5,000 fee and was assured the license would be granted at the next meeting of the commission but that Williams abandoned the premises through non-payment of rent, and therefore the application was canceled.

The trial committee found that the written agreement as set forth was entered into; that the accused failed to secure a liquor license on the original application or at any other time as contemplated in the agreement; that the accused took most of the necessary steps required to secure the license; that the accused failed and refused to return any part of the $5,000 although it was demanded; that he failed to afford Williams any statement of the extent of his services or their value; that the accused subsequently learned that Williams' lessor had a claim to the $5,000; that the accused withdrew the $5,000 from his trust account; that the effort to secure the license was frustrated by the moratorium which was not contemplated by either party; that the possibility of securing a license ended because of Williams' voluntarily forfeiting his lease and that had there been no such forfeiture the license might have been granted; that the written agreement did not represent the actual agreement between the parties but was made knowingly between the accused and Williams with the intent to deceive a third party; that the accused made a substantial effort to secure the license and based upon the actual agreement and the circumstances the accused is entitled to a reasonable attorney's fee, the extent of which the committee was

unable to determine; and lastly that the accused commingled trust funds with those of his own.

The trial committee concluded that the conduct of the accused was unethical.

The third charge against the accused alleges that one Mona Denton, who was injured in an automobile accident on September 25, 1971, retained the accused to represent her and that on March 31, 1972, the accused settled the Denton case for a gross recovery of $2,084.55; that the accused promptly paid Denton her net share of the proceeds and retained $60 and $500 to be paid respectively to two doctors; that the $60 was not paid until May 3, 1972, and the $500 was not paid until October 3, 1972.

The accused's trust account discloses that $2,084.55 was deposited March 31, 1972. At that time there was a balance of $5 in the account. There were two other checks not mentioned in the charge which were paid out of the settlement: one to Providence Hospital for $62 and one to Sandy Boulevard Dodge for $334.55 for the repair of Denton's automobile. The trust account shows that the $62 check cleared on April 5, a check for cash in the amount of $1,200 on April 7, and a $728 check to Denton on April 11. This left a balance on April 11 of $93.10. No other deposits were made during these withdrawals. On April 25 a deposit of $500 was made and on the same day the check for Sandy Boulevard Dodge in the sum of $334.55 cleared the bank. The $60 check to the one doctor cleared the first part of May and the $500 check to the other doctor cleared the first part of October. From March to October there were many times that the accused's trust account was less than $500. Denton testified that she repeatedly called

the accused or his office to complain that the major doctor bill had not been paid and to tell the accused that the doctor's office was dunning her for it.

The accused testified that he drew the $1,200 from his trust account for a business trip and that he was under the impression that he had that much in earned fees in the account which he had not previously withdrawn. His testimony is somewhat incredible because he testified he had changed his trust account from one bank to another on March 21 because of difficulty resulting from a bitterly contested divorce case with his wife. The account was opened with a deposit of $1,805 of which $1,800 was drawn out by one check on March 24 and no other deposit was made until he deposited the Denton draft on March 31.

The accused testified that the checks for the doctor bills were made out at the time the insurance company draft was deposited but were postdated to April 10 to allow clearance of the draft and were put in the file for mailing when the draft cleared. He said there was a discrepancy between the amount billed by the doctor and the amount attributable to the particular accident and he asked the doctor's office to send him a bill for the correct amount of $500, which was not done. He said he thought the corrected bill had been received and the check mailed and that when he learned such was not the case, he sent the check, but the doctor did not cash it because the amount was different than the total amount owed by Denton to the doctor, who held it awaiting a talk with the accused concerning it. The doctor involved wrote a letter in March of 1973 which, among other things, stated as follows:

"Any delay and payment of the original agreed amount of $500.00 was due to a misunderstanding

and we have no complaint about the time of payment, and regret that Mrs. Denton was embarrassed while this matter was being resolved.

"* * * * *

"We are sorry to cause you these frustrations due to our not submitting these charges in time for the initial settlement."

The trial committee found that the allegations of fact in the Denton charge were true as alleged in the complaint but it found that the failure of the accused to make the payments was not unethical, willful or intentional, but was negligent. However, it found that the accused had commingled funds belonging to the creditors of Denton with those of his own.

It is unnecessary to encumber the record with the facts of the fourth charge of misconduct because the trial committee found the accused not guilty of any impropriety in connection with this charge, and this court is in complete agreement with its finding.

The trial committee concluded that the accused was guilty of unethical practice which was in violation of the standards of conduct established by the Oregon State Bar and recommended that he be

(1) administered a public reprimand; and

(2) placed on probation for not less than three years subject to the following conditions:

    (a) if he violate any provision of probation that he be suspended for an indefinite time and until he can make a showing that he is able to accept the responsibilities of a member of the bar;

    (b) that he retain accountants to install an accounting system to cover his client and general office accounts;

    (c) that he be required to file a certified audit on an annual basis with the Oregon State Bar during the period of his probation;

    (d) that he replace the Williams' $5,000 in his trust account until his dispute with Williams is resolved; and

    (e) that he shall comply with the Rules of Professional Conduct.

The matter was tried de novo on the record by this court. We agree with the findings of the trial committee concerning the conduct of the accused in relation to the Wood matter and with its conclusion that such conduct was unethical.

In the Williams matter it is not entirely clear from the factual findings in what respect the trial committee thought that the written agreement was not the actual agreement of the parties. We assume it concluded that the actual agreement did not require the entire amount to be held in trust but that the funds could be drawn against for expenses and services. We do not believe the committee's finding in this respect is correct. First, the written agreement is specific that the entire amount is to be held in trust and Williams' testimony is to the same effect. Second, Williams testified that the accused's original offer was $500 for investigation and $4,500 more if the application was successful and that when he demurred, the offer encompassed within the written agreement was made. This has a ring of truth because what Williams said was the original offer so closely parallels the proposition made by the accused in the Wood matter which has previously been discussed. In addition, an agreement that the money may be spent or drawn on for fees but has to be returned does not make much sense in

this context. If the accused needed the money for expenses and fees as he did the work, where was the money going to come from to replace it in case of failure?

It really does not make a great deal of difference because it is clear from the evidence that the accused drew approximately the entire sum from the trust account within two weeks and before he performed all the services. In fact, he drew it out two months before the application was filed and his principal investigation was made.

Regardless of which version of the agreement is correct, it is clear that the venture was frustrated by an occurrence which was not contemplated by the parties—the moratorium and resultant shortage of funds by Williams caused by the lapse of time. Under such circumstances, the accused was entitled to a reasonable sum for his services but not the entire amount. Even Williams recognized that such was the case as evidenced by his offer to permit a reasonable fee to be deducted. However, the accused insisted he was entitled to the entire amount, yet he gave his client no written account of his services or of their value. He attempted to hide behind the proposition that he subsequently found the money came from Williams' lessor and that she had a claim to it. If such was the case, his responsibility was to Williams and not to Williams' lessor.

Even if the accused's version of what occurred were correct in every respect, he is still guilty of conspiring with his client to misrepresent the facts to a third party. We agree with the trial committee's conclusion that the accused's conduct was unethical, but

take a more serious view of what occurred. We find that he did not hold the funds in trust as he contracted to do, that he failed to account for the extent and value of his services and to return the balance as equitable conduct required, and, further, that he commingled his client's trust funds with those of his own.

In the Denton matter it is difficult to accept the accused's explanation that when he cashed the $1,200 check he thought the other checks issued out of the Denton funds had cleared the bank and that he had that much in fees in the trust account. He testified he started a new trust account in a different bank on March 21, and he did not close the old one out because there was almost no money in it. On March 21 the new account was opened by the depositing of $1,805 of which $1,800 was checked out in one item on March 24. There were no deposits between March 24 and the deposit of the Denton draft on March 31. There was no place for the fees to come from which he claims he thought were in the account, and such a short time had elapsed between the opening of the new account and the deposit of the Denton draft that he must have known such was the case.

Though he testified to the contrary, we cannot accept his explanation that he did not know he was using Denton draft funds above the amount of his fees. We therefore have to disagree with the trial committee that the failure to pay the doctor the $500 for a period of six months was negligent rather than intentional, and we must find that he intentionally commingled trust funds with those of his own and failed to pay the doctor bill promptly. We conclude the accused's conduct in the Denton matter was unethical.

The accused is guilty of serious misconduct in three instances involving commingling of clients' funds with those of his own, and in failing to turn over to his clients or their designees funds of theirs held by him.[1] There is a repetitive picture of the use of trust funds for his own purposes though, for reasons that are not apparent to us, there is no specific charge in the complaint of misappropriation. We are unable to agree with the trial committee that a public reprimand plus probation is an appropriate disposition of this disciplinary matter. The accused is suspended for a period of three years, and for such further time until he makes a showing to this court that his conduct has been such during his period of suspension that he is entitled to be reinstated in the practice of law.

---

[1] See Oregon State Bar Code of Professional Responsibility Disciplinary Rules 9-102 (A) (2) and 9-102 (B) (4).